UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DRAKES COLLISION, INC., et al.,

                Plaintiffs,

                                      Civil Case No. 19-13517

v.                                   Honorable Linda V. Parker

AUTO CLUB GROUP
INSURANCE CO., et al.,

                Defendants.

_____/

## OPINION AND ORDER

This lawsuit arises from an October 22, 2019 "raid" of Plaintiff Drakes Collision, a motor vehicle repair facility. The raid was conducted allegedly by Defendants Oakland County Auto Theft Squad ("OCATS"), National Insurance Crime Bureau ("NICB"), NICB employee Larry Lafonde, and officers from the Oakland County Sheriff's Department, Southfield Police Department, and Farmington Hills Police Department. Plaintiffs allege that the raid was precipitated by reports from insurance adjusters working for Defendant Auto Club Group Insurance Company ("Auto Club"): Defendants Melissa Comini, Sheryl Rembo, and Josh Taylor. In addition to Drakes Collision, Plaintiffs are several

Drakes Collision employees: Bassam Shammami, Jaquelyn Sawicki, Katelyn McNulty, Amjad Alaarj, Mark Sedgeman, Thomas Pannette, and John Pannette.

In an Amended Complaint filed January 21, 2020, Plaintiffs assert several counts against Defendants:

I. Federal Claim Violation of the Federal Civil Rights Act of 1871 42 U.S.C § 1983 Fourth and Fourteenth Amendment Violations – False Arrest, False Imprisonment, and Unreasonable Search and Seizure (as to Defendant[s] OCATS, NICB and NICB agent Larry Lafonde);

II. Federal Claim Conspiracy to Violate the Federal Civil Rights Act of 1871 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Violations – False Arrest, False Imprisonment, and Unreasonable Search and Seizure (as to Defendants AAA[1], NICB, Lafonde, Comini, Rembo and Taylor);

III. Federal Claim Violation of the Second Amendment of the United States of America and Fourteenth Amendment Equal Protection Under the Laws (as to Defendants Quisenberry, Baldes, Defendant NICB and Defendant Larry Lafonde);

IV. State Law Claim False Arrest (as to Defendant OCATS, Defendant Officers, Defendant NICB and Lafonde);

V. State Claim False Imprisonment (as to Defendant[s] OCATS, Officers, NICB and Lafonde);

VI. Violation of MCL 500.2110B – Michigan Anti-Steering Statute the Insurance Code of 1956

---

[1] Plaintiffs refer to Auto Club as "AAA" throughout their filings.

2

(Excerpt) (as to Defendant AAA Insurance,
Defendant Comini);

VII.   Violation of Michigan Compiled Law
       600.2911(1) – Defamation Per Se and Defamation
       (as to Defendant[s] OCATS, Baldes, AAA,
       Rembo, Comini and Taylor); and,

VIII.  Civil Conspiracy (as to All Defendants).

(Am. Compl., ECF No. 19 (capitalization removed).)  The matter is presently

before the Court on motions to dismiss filed by Defendants Auto Club, Comini,

Rembo, and Taylor (collectively the "Auto Club Defendants") (ECF No. 22),

Oakland County Sheriff's Department Police Officer Chad Jackson (ECF No. 25);

Farmington Hills Police Department Officer Justin Berry (ECF No. 26) and

Southfield Police Department Officer Jarod Womble (ECF No. 37.)  The motions

have been fully briefed.  Finding the facts and legal issues adequately addressed in

the parties' submissions, the Court is dispensing with oral argument with respect to

the pending motions pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.    Standard of Review

Defendants' motions to dismiss are filed pursuant to Federal Rule of Civil

Procedure 12(b)(6), except for Womble's motion which is filed pursuant to Rule

12(c).  However, a motion for judgment on the pleadings pursuant to Rule 12(c) is

subject to the same standard of review as a Rule 12(b)(6) motion to dismiss for

failure to state a claim upon which relief can be granted.  *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998).

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . .." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id*. (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading

stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

Plaintiffs repeatedly assert throughout their response briefs that the Amended Complaint sufficiently alleges claims against the moving defendants when viewed through the "no-set-of-facts" standard outlined in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).[2]  (*See, e.g.*, Resp. Br. at 5, 10, 13, ECF No. 28 at Pg ID 716, 721, 724; Resp. Br. at 4, ECF No. 29 at Pg ID 751; Resp. Br. at 10, ECF No. 39 at Pg ID 1065.)  Plaintiffs further repeatedly state that motions to dismiss are "disfavored and rarely granted[,]" citing cases preceding the Supreme Court's decisions in *Iqbal* and *Twombly*.  (*See, e.g.,* Resp. Br. at 6-7, ECF No. 29 at Pg ID 753-54.)  Yet *Iqbal* and *Twombly* "raised the bar for pleading requirements beyond the old 'no-set-of-facts' standard of *Conley v. Gibson*[.]"  *Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629 (6th Cir. 2009) (citations omitted).

Complaints regularly survived motions to dismiss under the *Conley* standard, because it "was designed to screen out only those cases that patently had no theoretical hope of success."  *Id.*  Those were cases where the allegations were "sufficiently fantastic to defy reality as we know it: claims about little green men,

---

[2] In *Conley*, the Supreme Court indicated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46.

or the plaintiff's recent trip to Pluto, or experiences in time travel." *Iqbal*, 556

U.S. at 1959 (Souter, J., dissenting); *Courie*, 577 F.3d at 629 (quoting Justice

Souter's dissent). Subsequent to *Iqbal* and *Twombly*, however, a complaint

survives only if it "contain[s] sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face.'" *Courie*, 577 F.3d at 629 (quoting

*Iqbal*, 556 U.S. at 678).

      In deciding whether the plaintiff has set forth a "plausible" claim, the court

must accept the factual allegations in the complaint as true. *Erickson v. Pardus*,

551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions,

however. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

(citing *Twombly*, 550 U.S. at 555).

      Ordinarily, the court may not consider matters outside the pleadings when

deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d

86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir.

1989)). A court that considers such matters must first convert the motion to

dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However,

"[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the

[c]omplaint and any exhibits attached thereto, public records, items appearing in

the record of the case and exhibits attached to [the] defendant's motion to dismiss,

so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## II.   Factual Background

Drakes Collison is a motor vehicle repair facility located in Southfield, Michigan.  (Am. Compl. ¶ 29, ECF No. 19 at Pg ID 372.)  It is licensed by the State of Michigan.  (*Id*. ¶ 39, Pg ID 377.)  Drakes Collision's primary source of business is derived from repairing the damaged vehicles of insured motorists.  (*Id*. ¶ 29, Pg ID 372)  Those motorists are insured by a variety of insurance carriers, including Auto Club.  (*Id*. ¶ 31, Pg ID 373.)  Insurance carriers have contractual relationships with specific repair facilities—referred to as Direct Repair Program shops—pursuant to which labor rates and part prices have been negotiated.  (*Id*. ¶ 30, Pg ID 372-73.)  Drakes Collision is not such a shop.  (*Id*.)

Under Michigan's Motor Vehicle Service and Repair Act ("Act" or "MVSRA"), Michigan's Secretary of State, his or her designate, and law enforcement officials are authorized to perform "periodic unannounced inspections of the premises, parts records, and parts inventories" of licenses repair facilities. *Id.* ¶ 39, Pg ID 377); *see also* Mich. Comp. Laws § 257.1317(1).  These inspections must occur "[d]uring reasonable business hours[.]"  (*Id*.)  Licensed

repair facilities, such as Drakes Collision, are required by statute to allow access to their premises for these inspections.  (*Id*.)

On October 22, 2019, OCATS[3], NICB, and NICB agent Lafonde conducted such an inspection—or "warrantless search" as Plaintiffs describe it—of Drakes Collision.  (Am. Compl. ¶ 41, ECF No. 19 at Pg ID 377-78.)  The inspection occurred during Drakes Collision's normal business hours, while customers were present.  (*Id*. ¶ 43, Pg ID 378.)

The OCATS officers and Lafonde arrived at Drakes Collision in numerous police vehicles and "blocked the roadways and effectively interrupted and shut down all business operations."  (*Id*.)  While Plaintiffs allege the officers were in uniform and armed (*id.*), materials attached to Plaintiffs' Amended Complaint reflect they were armed but wore plain clothes (*id*. Exs. B, C, E, ECF No. 19-3, 19-4, 19-6).  Upon their arrival, the officers "rounded up" the facility's employees and "forced them to sit in a designated area[.]"  (*Id*. ¶ 44, Pg ID 379.)  The photographs

---

[3] OCATS is a multi-jurisdictional auto theft team directed by the Oakland County Sheriff's Office.  (Am. Compl. ¶ 41, ECF No. 19 at Pg ID 377); *see also https://www.oakgov.com/sheriff/Law-Enforcement/Investigative-Forensic-Services/Pages/default.aspx#:~:text=The%20Oakland%20County%20Sheriff's%20Auto,theft%20rate%20has%20dropped%2079%25* (visited 9/23/20).  It appears that the officers named in the Amended Complaint, who are employed by various police departments within Oakland County, were working on the task force at the time of the inspection of Drakes Collision.

attached to Plaintiffs' pleading reflect that this area was the customer waiting area. (*See* Ex. C at 2, 5, ECF No. 19-4 at Pg ID 465, 468.)

The officers asked the employees whether they possessed any weapons and "ordered" armed employees to secure their weapons in other locations (i.e., the employees' personal vehicles or toolboxes). (*See, e.g.*, Shammami Aff. ¶ 5, ECF No. 19-5 at Pg ID 470; Alaarj Aff. ¶ 5, ECF No. 19-5 at Pg ID 474.) The employees were forced to remain in the waiting area for "upwards of two hours[.]" (*See, e.g.*, Shammami Aff. ¶ 6, ECF No. 19-5 at Pg ID 470-71; Alaarj Aff. ¶ 6, ECF No. 19-5 at Pg ID 474.) Employees who wanted to smoke had to ask permission to leave and were followed outside and watched by an officer. (Alaarj Aff. ¶ 6, ECF No. 19-5 at Pg ID 474.) Officers were stationed at the entrance and exit points to the business and parking lots. (Am. Compl. ¶ 49, ECF No. 19 at Pg ID 382.)

While the search ensued, Baldes of OCATS accused the manager of Drakes Collision, Shammami, of having improper relationships with other auto theft team members, namely Action Auto Theft, and using those relationships and paying bribes to acquire recovered stolen vehicles. (Shammami Aff. ¶ 9, ECF No. 19-5 at Pg ID 471.) According to Shammami, Auto Club adjuster Comini accused him of the same type of conduct weeks prior to the raid. (*Id*. ¶ 11, Pg ID 471.)

Shammami states that Comini was steering Drakes Collision clients to other collision shops with which Auto Club had vendor relations.  (*Id.*)

During the search, OCATS officers also "made defamatory statements alleging Drakes Collision engaged in the felony crime if [sic] Receiving and Concealing Stolen Property" in the presence of a State Farm Insurance adjuster, who happened to be present.  (Am. Compl. ¶ 51, ECF No. 19 at Pg ID 383.) Plaintiffs allege that "independent witnesses, including representatives from insurance companies and parts suppliers, present during the incident" can verify the events (including the officers' statements) that day.  (*Id.*)

Plaintiffs surmise that the inspection of Drakes Collision was precipitated by an earlier confrontation between Comini and Shammami.  (*Id.* ¶ 52, Pg ID 383-84.) The confrontation related to a stolen 2018 Jeep Grand Cherokee, which the Action Auto Theft Squad recovered and towed to Drakes Collision.  (*Id.* ¶¶ 52-55, Pg ID 383-84.)  Auto Club insured the vehicle and its insured had signed a work order for Drakes Collision to repair the vehicle.  (*Id.* ¶ 56, Pg ID 385.)

On October 12, 2019, Auto Club adjuster Taylor inspected the Jeep at Drakes Collision.  (*Id.* ¶ 57, Pg ID 385.)  Auto Club adjuster Rembo inspected the vehicle again on a subsequent date and made a referral to the Auto Club's Special Investigative Unit ("SIU") for further inquiry.  (*Id.* ¶ 58, Pg ID 385.)  Auto Club hired a third-party vendor to perform an Accident Damage Analysis, which

10

Plaintiffs allege "suggest[ed] shop fraud being engaged in by Plaintiff Drakes Collision." (*Id.*) Comini contacted Shammami and "demanded" that he provide a recorded statement, but he refused, stating he had no legal or contractual duty to do so. (*Id.* ¶¶ 59-60, Pg ID 385-86.) Comini told Shammami that if he failed to cooperate and provide a statement, she would "pull the vehicle out of the shop." (*Id.* ¶ 61, Pg ID 386.)

At some point in Fall 2019, Comini and Auto Club adjuster Gappe, visited Drakes Collision to inspect the Jeep. (*Id.* ¶ 62, Pg ID 386.) During the visit, Comini "interrogated" Shammami regarding his relationship with the Action Auto Theft Team "and in the presence of third parties, suggested an improper and unlawful connection between Shammami, [the] Action Auto Theft Team and the manner in which the vehicle was recovered and towed to Plaintiff Drakes Collision." (*Id.*, Pg ID 386-87.) Subsequent to that interaction, the owner of the Jeep declined to have the vehicle repaired at Drakes Collision and removed it from the shop. (*Id.* ¶ 63, Pg ID 387.) Plaintiffs indicate that Rembo told the vehicle owner that the tires to his vehicle had not been stolen and were the original tires, the insurance claim was therefore suspicious, and that Drakes Collision was under investigation. (*Id.* ¶ 65, Pg ID 388.)

A similar incident occurred with respect to a 2013 VW Beetle, which Auto Club insured. (*Id.* ¶¶ 67-69, Pg ID 389.) The owner of the vehicle initially had it

11

towed to Drakes Collision for repairs but moved it the following day to one of Auto Club's Direct Repair Program shops.  (*Id.* ¶¶ 67-69, Pg ID 389.)  The owner informed Drakes Collision that Auto Club adjusters stated that Auto Club "had problems with Drakes Collision" and that "Drakes Collision was under investigation."  (*Id.* ¶ 69, Pg ID 389.)  The owner indicated that Auto Club "bad mouthed" Drakes Collision.  (*Id.*)

The owner of a 2013 Ford Fusion, which had been burned, brought the damaged vehicle to Drakes Collision for repairs and signed a work order.  (*Id.*, ¶¶ 72-73, Pg ID 391.)  Later the same day, however, Rembo arrived at Drakes Collision and had the vehicle towed to a different repair facility.  (*Id.* ¶¶ 72-74, Pg ID 391-92.)  Rembo claimed Drakes Collision did not have permission for the vehicle to be towed there and so she was removing it to one of Auto Club's Direct Repair Program shops.  (*Id.* ¶ 75, Pg ID 392.)  Rembo apparently indicated that the matter was being investigated by Auto Club's SIU and had been referred to a third-party investigative company for a cause and origin investigation of the arson.  (*Id.* ¶ 76, Pg ID 392.)  Rembo advised the Fusion owner that the vehicle had "no business being at Drakes Collision" and that "Drakes Collision was under investigation."  (*Id.* ¶ 77, Pg ID 393.)

Plaintiffs allege that Comini, Rembo, and Taylor "implement … NICB 'red flag predicators' for the purpose[] of conducting racially motivated pretextual

claims investigations, which would include identifying 'suspect Chaldean body shops' such as Plaintiff Drakes Collision."  (*Id.* ¶ 32, Pg ID 373-74.)  According to Plaintiffs, Auto Club and its agents have engaged in "a long-history of utter disregard, disrespect and racially motivated disregard towards Plaintiff Drakes …." (*Id.* ¶ 79, Pg ID 394.)

III.    **Applicable Law & Analysis**

    A.    **Plaintiffs' False Arrest, False Imprisonment and Unreasonable Search and Seizure Claims**

In Counts I, II, IV, and V of the Amended Complaint, Plaintiffs assert violations of their federal civil rights and state law based on Defendants' "raid" of Drakes Collision.  Plaintiffs allege that the raid and Defendants' conduct during it amounted to an unlawful warrantless search and seizure of Drakes Collision and its employees.

The Auto Club Defendants argue that they are not liable under § 1983 for the alleged violations of Plaintiffs' civil rights as they are not state actors.  The moving defendants all argue that Plaintiffs fail to allege sufficient facts to support these claims.  Womble argues that Plaintiffs' search and seizure claims fail because Defendants engaged in a lawful warrantless administrative inspection of Drakes Collision pursuant to the MVSRA and the inspection was conducted in a reasonable manner.  The Court considers first whether the warrantless search of Drakes Collision, conducted pursuant to a statute authorizing inspections of such

repair facilities, falls within the exception to the Fourth Amendment's warrant requirement for administrative inspections of closely regulated industries.

### 1) The *Colonnade-Biswell* Doctrine

It is well established that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as private residences, and searches conducted to gather criminal evidence, as well as "administrative inspections designed to enforce regulatory statutes." *New York v. Burger*, 482 U.S. 691, 699 (1987) (citations omitted). Generally, the government must obtain a warrant, supported by probable cause, prior to entering commercial premises. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312-313 (1978). Probable cause to search commercial premises is tempered, however, when a search is conducted pursuant to an administrative regime and the "search is conducted for a 'special need' other than to investigate criminal wrongdoing."[4] *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018). The Supreme Court has recognized further that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Burger*, 482 U.S. at 699 (internal

---

[4] The "open-to-the-public exception" also allows the government to make a warrantless entry of commercial premises that are open to the public and inspect what is observable to the public, even if the officers enter the premises purely for an investigative purpose. *Marshall*, 436 U.S. at 315.

citations omitted). "No warrant or opportunity for precompliance review may be required at all for searches conducted of businesses in these industries since they are already subject to extensive government oversight and accordingly possess reduced privacy interests." *Liberty Coins*, 880 F.2d at 280 (citing *Marshall*, 436 U.S. at 313.

At this juncture, the Supreme Court has identified four closely regulated industries to which this warrant exception, commonly known as the *Colonnade-Biswell* doctrine, applies: (1) liquor sales[5]; (2) gun sales[6]; (3) mining[7]; and (4) automobile junkyards.[8] Contrary to Plaintiffs' repeated assertions, this is not an exhaustive list of the industries to which the doctrine is applicable, as is evident by the fact that the Sixth Circuit has identified several more: (5) pharmacies[9]; (6) sand and gravel[10]; and (7) precious metals.[11] The Michigan state courts have recognized the following as closely regulated industries for which unannounced warrantless inspections do not offend the Michigan Constitution or United States Constitution:

---

[5] *Colonnade Corp. v. United States*, 397 U.S. 72, 77 (1970).

[6] *United States v. Biswell*, 406 U.S. 311, 316 (1972).

[7] *Donovan v. Dewey*, 452 U.S. 594, 602-03 (1981)

[8] *Burger*, 482 U.S. at 707.

[9] *United States v. Acklen*, 690 F.2d 70, 75 (6th Cir. 1982).

[10] *Marshall v. Nolichuckey Sand Co.*, 606 F.2d 693, 696 (6th Cir. 1979)

[11] *Liberty Coins*, 880 F.3d at 285.

(8) salvage yard and vehicle repair shops[12]; (9) massage parlor[13]; (10) tobacco[14];

and (11) commercial fishing.[15]  *See also Tallman v. Dep't of Nat. Res.*, 365

N.W.2d 724, 738-39 (Mich. 1984) (adopting the "pervasively regulated industry"

doctrine in Michigan and setting forth seven factors to balance when determining

whether an industry falls within the doctrine).

The Supreme Court and Sixth Circuit have identified three factors for courts

to consider when determining whether an industry is "closely regulated" for

purposes of the administrative search exception to the Fourth Amendment's

warrant requirement: (1) "'the pervasiveness and regularity' of regulations

governing an industry; (2) 'the duration of a particular regulatory scheme'[16]; and

---

[12] *People v. Barnes*, 379 N.W.2d 464, 466 (Mich. Ct. App. 1985); *People v. Csernai*, No. 205832, 205833, 2000 WL 33416873, *1 (Mich. Ct. App. July 14, 2000).

[13] *Gora v. City of Ferndale*, 576 N.W.2d 141, 147-48 (Mich. 1998).

[14] *People v. Beydoun*, 770 N.W.2d 54, 67 (Mich. Ct. App. 2009).

[15] *Tallman v. Dep't of Nat. Res.*, 365 N.W.2d 724, 745 (Mich. 1984).

[16] While the duration of the regulatory scheme may be relevant, the Supreme Court has expressly rejected it as an overriding factor, stating that "if the length of regulation were the only criterion, absurd results would occur."  *Donovan*, 452 U.S. at 606.  This is because "new or emerging industries, including ones such as the nuclear power industry that pose enormous potential safety and health problems, could never be subject to warrantless searches even under the most carefully structured inspection program simply because of the recent vintage of regulation."  *Id.*  Accordingly, the Court advised that "it is the pervasiveness and regularity of the … regulation that ultimately determines whether a warrant is

(3) whether other states have imposed similarly extensive regulatory requirements." *Liberty Coins*, 880 F.3d at 282 (quoting *Burger*, 482 U.S. at 701, 705). "[C]losely regulated industries are the 'exception,'" however, and the Supreme Court has "suggested that businesses operating within these industries all 'pose a clear and significant risk to the public welfare." *Id*. (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 424 (2015); *see also Burger*, 482 U.S. at 709 ("Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and vehicle parts.").

### 2) Whether the motor vehicle repair industry is closely regulated

As Womble identifies (*see* Mot. at 26-27, ECF No. 37 at Pg ID 936), and Plaintiffs do not really dispute, an analysis of the relevant factors reflects that the auto repair industry is closely regulated.[17] The auto repair industry is part of the larger auto industry discussed in *Burger*, which has a long history of regulation and

---

necessary to render an inspection program reasonable under the Fourth Amendment." *Id*.; *see also Burger*, 482 at 720.

[17] Plaintiffs do not counter Womble's arguments for why the relevant factors lead to the conclusion that the vehicle repair industry is closely regulated. (*See* Resp. at 17-21, ECF No. 39 at Pg ID 1072-76.) Instead, Plaintiffs simply contend that this conclusion is incorrect because "[n]ever in th[e] history of this nation has any federal court EVER deemed an auto repair facility to fall under the very limited 'Colon[n]ade-Biswell Doctrine' to allow for limited purposes a warrantless search." (*Id*. at 20, Pg ID 1075 (emphasis removed).)

17

is informed by substantial government interests.  *See Burger*, 482 U.S. at 702, 708;

*Csernai*, 2000 WL 33416873 (Mich. Ct. App. July 14, 2000) (holding that the

warrantless search of the defendant's vehicle repair shop pursuant to the MVSRA

was lawful as an administrative search of a closely-regulated industry).  Those

interests include preventing and identifying stolen and illegal vehicle parts activity,

*Burger*, 482 U.S. at 708; *Csernai*, 2000 WL 33416873, at *2, and "remedy[ing]

'gross abuses' by the … industry."  *Anaya v. Betten Chevrolet, Inc.*, 946 N.W.2d

560, 564 (Mich. Ct. App. 2019) (quoting *Auto. Serv. Councils of Mich. v. Sec. of

State*, 267 N.W.2d 698, 709 (Mich. Ct. App. 1978)).  The Michigan Court of

Appeals explained in *Anaya*:

> Our review of the statute as a whole supports the
> conclusion that the legislature intended to regulate repair
> procedures and to ensure the customers were only
> charged for repairs that were necessary and were actually
> performed as well as to protect individuals from
> unknowingly driving vehicles repaired with substandard
> parts or unrepaired malfunctions.

946 N.W.2d at 566.  As in *Burger*, warrantless administrative inspections of

vehicle repair facilities "'are necessary to further the regulatory scheme.'"  482

U.S. at 710 (quoting *Donovan*, 452 U.S. at 600) (brackets omitted).

The MVSRA has been in effect for over forty years.  *See* 1988 Mich. Legis.

Serv. 254 (amending Public Acts of 1974).  Many states and municipalities have

similar laws and requirements for the vehicle repair subsect of the auto industry.

18

*See, e.g.*, Cal. Vehicle Code § 2805 (West); N.J. Stat. Ann. § 39:13-3 (West); 625 Ill. Comp. Stat. 5/5-403; Cleveland Codified Ordinances § 601.15; Va. Code Ann. § 46.2-110; Conn. Gen Stat. § 14-64; Fla. Stat. § 812.055; Tenn. Code Ann. § 55-14-106.  Relying on these statutes, state and federal courts have concluded that the auto body repair industry is closely or pervasively regulated.  *People v. Potter*, 27 Cal. Rptr. 3d 289, 294 (Cal. Ct. App. 2005) (California); *State v. Bromell*, 596 A.2d 1105, 1109 (N.J. Super. Ct. Law Div. 1991) (New Jersey); *Bionic Auto Parts & Sales, Inc. v. Fahner*, 721 F.2d 1072, 1081 (7th Cir. 1983) (Illinois); *State v. Zinmeister*, 501 N.E.2d 59, 64-65 (Ohio Ct. App. 1985) (Ohio); *Shirley v. Commonwealth*, 235 S.E.2d 432 (Va. 1977); *see also State v. Tindell*, 399 N.E.2d 746, 748 (Ind. 1980) (evaluating now repealed Indiana statute and concluding that the auto industry in Indiana is extensively regulated and that dealers are subject to warrantless searches).

### 3)      Whether the search was reasonable

Nonetheless, even when the closely regulated industry exception dispenses with the need for a warrant, the Fourth Amendment still requires the government's intrusion into the property to be reasonable.  *Donovan*, 452 U.S. at 599-600.  The regulatory scheme authorizing warrantless inspections must meet three requirements to be deemed reasonable: (1) the scheme must serve a substantial governmental interest; (2) the warrantless inspections must be necessary to further

19

the regulatory scheme; and (3) the inspection program "must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 702-703; *Liberty Coins*, 800 F.3d at 281. The administrative scheme regulating the vehicle repair industry, as codified in the MVSRA, sets forth requirements similar to those analyzed in *Burger*, which the Supreme Court found sufficient to satisfy the three criteria needed to make warrantless inspections pursuant to the statute reasonable. *See Burger*, 482 U.S. at 708-11; *see also People v. Barnes*, 379 N.W.2d 464, 467-68 (Mich. Ct. App. 1985) (examining Michigan's salvage yard statute, which is almost identical to the MVSRA, and finding the statute's warrantless inspection requirement to be reasonable).

As discussed above, Michigan has substantial interests in regulating the vehicle repair industry and the MVSRA reasonably serves those substantial interests. *See Burger*, 482 U.S. at 708; *see also* Mich. Comp. Laws Ch. 257 ("AN ACT to regulate the practice of servicing and repairing motor vehicles; to proscribe unfair and deceptive practices; to provide for training and certification of mechanics; to provide for the registration of motor vehicle repair facilities; to provide for enforcement; and to prescribe penalties.") (capitalization in original).

20

Warrantless searches of auto-body repair facilities are necessary to further those

interests, for the reasons identified by the Supreme Court in *Burger*:

> "[I]f inspection is to be effective and serve as a credible
> deterrent, unannounced, even frequent, inspections are
> essential.  In this context, the prerequisite of a warrant
> could easily frustrate inspection; and if the necessary
> flexibility as to time, scope, and frequency is to be
> preserved, the protections afforded by a warrant would be
> negligible."

482 U.S. at 710 (quoting *United States v. Biswell*, 406 U.S. 311, 316 (1972)).

Lastly, the Act provides a "'constitutionally adequate substitute for a warrant.'"

*Id.* at 711 (quoting *Donovan*, 452 U.S. at 603).

The MVSRA informs owners of vehicle repair facilities that unannounced

inspections will be made on a regular basis by the administrator, his or her

designate, and law enforcement officers.  Mich. Comp. Laws § 257.1317.  The Act

also sets forth the scope of the inspection: "to determine whether or not the facility

is in compliance with th[e] act and rules promulgated [t]hereunder." *Id.*  It puts

facility owners on notice as to how to comply with the statute's various

requirements.  *See, e.g., id.* §§ 257.1314, 257.1322.  Finally, "the 'time, place, and

scope' of the inspection is limited … to place appropriate restraints upon the

discretion of the inspection officers." *Burger*, 482 U.S. at 711 (citations omitted).

The MVSRA allows inspections only during "reasonable business hours."  Mich.

Comp. Laws § 257.1317.  Inspections are restricted to the "premises, parts records, and parts inventories of a facility."  *Id*. (emphasis added).

In their response brief, Plaintiffs point to certain aspects of the inspection described in the Amended Complaint, which the Court construes to be for the purpose of contending that the search was unreasonably executed: (i) blocking the roadways with their vehicles; (ii) being armed and in uniform; (iii) standing by the business doors; (iv) "forging through scrap piles"; (v) searching employees for and disarming them of lawfully carried weapons, and (vi) "round[ing] [employees] up and forc[ing] them to sit in a designated area for upwards of two hours."  Plaintiffs contend that the officers conducted the search for "the primary purpose" of "detect[ing] evidence of ordinary criminal wrongdoing."  (Resp. Br. at 26, ECF No. 39 at Pg ID 1081 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).)  Plaintiffs also allege that the "raid" was motivated by their ethnicity, national origin, and/or religious background.  For the reasons discussed below, none of these allegations, even when viewed in totality, support the conclusion that the inspection was conducted unreasonably.

### a.    Armed uniformed officers

Notably, the exhibits attached to Plaintiffs' Amended Complaint reflect that the officers were not in uniform.  (*See* Am. Compl. Ex. B at 2-5, ECF No. 19-3 at Pg ID 460-63; Ex. C at 3-5, ECF No. 19-4 at Pg ID 466-68; Ex. E at 2-5, ECF No.

19-6 at Pg ID 488-91.) They are in street clothes, with most wearing basic black pull-over or zip-up sweatshirts. (*Id.*) Two or three officers pictured in Plaintiffs' exhibits are wearing police badges on chains around their neck. (*Id.*) While some of the officers may have been armed, there is no suggestion that any officer drew a weapon or pointed a weapon at anyone.

In any event, the MVSRA authorizes officers to participate in an administrative search, *see supra*; and, it would not be unreasonable to assume that those officers would be in uniform and perhaps armed. Plaintiffs do not allege that the officers entered the premises with their weapons drawn or that any officer pointed a weapon at anyone. *See ABCDE Operating, LLC v. City of Detroit*, 254 F. Supp. 3d 931, 951, 954-55 (E.D. Mich. 2017) (finding administrative search reasonable in part because, even though the officers were armed and one carried a shotgun "in a 'high ready' position" as he entered the premises, there was not the show of force present in cases like *Bruce v. Beary*, 498 F.3d 1232, 1244 (11th Cir. 2007) and *Club Retro, LLC v. Hilton*, 568 F.3d 181, 191 (5th Cir. 2009)). In *Bruce* and *Club Retro*, where the courts found a question of fact as to the reasonableness of the officers' actions, multiple officers (20 and 40 respectively), entered the premises with weapons drawn and pointed the weapons at employees and/or patrons. *Bruce*, 498 F.3d at 1244 (officers entered premises with automatic shotguns and sidearms drawn); *Club Retro*, 568 F.3d at 191 (forty policy officers,

23

"some outfitted in full S.W.A.T. gear and black ski masks … stormed [the club] with shotguns, AR-15 assault rifles, and pistols drawn and pointed at both patrons and employees"); *see also Swint v. City of Wadley*, 51 F.3d 988, 992-93 (11th Cir. 1995) (30-40 officers entered premises, and some pointed weapons at employees and patrons).  In another Eleventh Circuit case, the court specifically distinguished the inspection from that in *Swint* in part because the officers conducted the search without displaying their weapons.  *Crosby v. Paulk*, 187 F.3d 1339, 1350 (11th Cir. 1999).  It is noteworthy that the Amended Complaint reflects that one NICB agent and seven officers participated in the administrative search of Drakes Collision. This does not appear to be the kind of "massive show of force" found unreasonable in other cases.  *See supra*.

### b.      Forging through scrap piles

Plaintiffs point to surveillance video showing Womble "forging through scrap piles" to suggest that the officers were searching for evidence of criminal wrongdoing.  (Resp. Br. at 26, ECF No. 39 at Pg ID 1081.)  Such conduct, however, is expressly permitted under the MVSRA.  Mich. Comp. Laws § 257.1317(1) (permitting the search of "parts inventories of a facility").

### c.      Detaining employees for upwards of two hours

Nor was the search of Drakes Collision rendered unreasonable because employees were forced to remain in the facility's waiting area for "upwards of two

24

hours" while it was being conducted.  To start, the materials attached to Plaintiffs'

Amended Complaint reflect that Drakes Collision's employees were seated in

chairs in the customer waiting area while the search was conducted.  (*See* Pls. Am.

Compl. Ex. B at 2-3, ECF No. 39-3 at Pg ID 1098-99.)  Plaintiffs allege that

employees had to request permission before going outside to smoke cigarettes.  (*Id.*

¶ 49, Pg ID 382.)  Plaintiffs do not claim that employees were denied permission to

smoke or use the bathroom.  Again, the presumed two-hour detention in this case is

distinguishable from the eight-hour raid in *Bruce*.  498 F.3d at 1244.  While it is

closer to *Swint*, where the raid lasted approximately one and one-half hours, the

circumstances of that raid—including the use of 30-40 officers in S.W.A.T gear

and ski masks who refused to let employees use the restroom—renders the cases

distinguishable.  *Swint*, 51 F.3d at 992-93; *see also Crosby v. Paulk*, 187 F.3d

1339, 1345-52 (11th Cir. 1999) (finding two-hour administrative inspection

reasonable).

Supreme Court precedent establishes that officers have the authority to

detain individuals while executing a lawful premises search in order to secure the

premises and ensure the safety of the officers.  *Michigan v. Summers*, 452 U.S.

692, 705 (1981); *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (holding that it also was

appropriate to use a reasonable amount of force to effectuate the detention).

Notably, "'[w]here a statute authorizes the inspection but makes no rules

25

governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply.'" *Bruce*, 498 F.3d at 1240 (quoting *Colonnade*, 397 U.S. at 77).

### d.    Searching employees and seizing their weapons

The affidavits attached to Plaintiffs' pleading reflect that employees were directed—notably not by any of the moving defendants[18]—to place their legally possessed weapons in their own vehicles or toolboxes during the inspection.  No facts support Plaintiffs' conclusory legal assertions that employees were personally "searched" or that their weapons were "seized."  In any event, the Fourth Amendment does not prohibit officers from taking reasonable actions to ensure their own safety while executing a lawful search.  *Los Angeles Cnty. v. Rettele*, 550 U.S. 609, 614 (2007) (when executing a lawful search, "officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search").

### e.    "Blocking" roadways and entrances

This aspect of the defendant officers' search of Drakes Collision does render it somewhat more similar to the raid at issue in *Bruce*, where officers

---

[18] It is a well-established principle of federal § 1983 law that "[e]ach defendant's liability must be assessed individually based on his [or her] actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2020).

arrived, surrounded the property and blocked the exits with their vehicles. 498

F.3d at 1244. But again, there were 20 officers involved in the search in *Bruce*,

officers wore SWAT uniforms with ballistic vests, entered with guns drawn, and

stuck an automatic shotgun into an employee's back. *Id.* at 1236, 1244.

### 4)      Qualified Immunity

Even if the reasonableness of the defendant officers' actions is questionable,

well established case law would not have informed them that their conduct was

unlawful. As such, they are entitled to qualified immunity.[19]

Qualified immunity protects state actors sued under § 1983 from damages

liability "insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v.*

---

[19] The Court acknowledges that, unlike governmental officials, private actors sued
under § 1983 cannot assert qualified immunity. *See Lee v. Ohio Educ. Ass'n*, 951
F.3d 386, 390 (6th Cir. 2020) (citing *Wyatt v. Cole*, 504 U.S. 158, 159 (1992)).
Nevertheless, even assuming that the Auto Club Defendants could be deemed state
actors liable under § 1983, Plaintiffs do not allege that they participated in the
search of Drakes Collision. As such, they could not be liable for the manner in
which it was conducted. *See Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647
(6th Cir. 2012) (citations omitted) ("Persons sued in their individual capacities
under § 1983 can be held liable based only on their own unconstitutional
behavior."). Moreover, the Sixth Circuit held in *Lee* that "'while a private party
acting under color of state law does not enjoy qualified immunity from suit, it is
entitled to raise a good-faith defense to liability under section 1983.'" 951 F.3d at
390-91 (quoting *Janus v. AFSCME, Council 31*, 942 F.3d 352, 363 (7th Cir.
2019)).

*Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted).  The determination of whether a government official is entitled to qualified immunity is a two-step inquiry: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?"  *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010) (internal quotation marks and citations omitted).  "If the law at th[e] time [of the conduct] did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability …."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. (citation omitted); *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015) (observing that the Court must "determine whether the contours of the right at issue have been made sufficiently clear to give a reasonable official fair warning").  Notably, the plaintiff bears the burden of demonstrating that the law is clearly established.  *Baynes*, 799 F.3d at 610 (citation omitted).

The MVSRA authorized the inspection of Drakes Collision by the administrator, his or her designate, and law enforcement officers, which included a search of the premises, the facility's records, and its parts inventories.  The scope and timing of the inspection were within the Act's bounds.  The Court has

concluded that warrantless administrative searches permitted under the Act do not offend the Fourth Amendment because the vehicle repair industry is closely regulated.  In any event, Plaintiffs cite no case law establishing that the industry is not closely regulated or that a warrantless search of a vehicle repair facility pursuant to an administrative or statutory scheme is unconstitutional.

Plaintiffs nevertheless contend that the inspection of Drakes Collison was unlawful because the administrative search exception does not apply where the primary purpose of the search "was to detect evidence of ordinary criminal wrongdoing."  *City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000).  However, the facts, as alleged in Plaintiffs' pleadings, do not support their contention that the search was conducted as a pretext for obtaining evidence of a crime.[20]  Plaintiffs point to surveillance video showing Womble "forging through scrap piles" to suggest that the officers were searching for evidence of criminal wrongdoing. (Resp. Br. at 26, ECF No. 39 at Pg ID 1081.)  Such conduct, however, is expressly

_____

[20] Plaintiffs also allege that the inspection was motivated by ethnic, national origin, and/or religious bias.  (*See* Am. Compl. ¶¶ 89, 91, 110, ECF No. 19 at Pg ID 399, 400, 411.)  These contentions do not impact the reasonableness of the inspection. Such contentions raise an equal-protection issue, not a Fourth Amendment one. *See Whren v. United States*, 517 U.S. 806, 813 (1995) ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").  The Court addresses whether Plaintiffs adequately plead an equal protection claim *infra*.

permitted under the MVSRA.  Mich. Comp. Laws § 257.1317(1) (permitting the

search of "parts inventories of a facility").  Further, in their Amended Complaint,

Plaintiffs expressly allege that the inspection was precipitated by reports from the

Auto Club Defendants that Drakes Collision was engaging in activity in violation

of the MVSRA.  (*See, e.g.*, Am. Compl. ¶¶ 32, 36, 58-66.)  "'[T]he Supreme Court

has made quite clear that an administrative search is not rendered invalid because it

is accompanied by some suspicion of [criminal] wrongdoing,'" *Rodriguez v. City*

*of Cleveland*, 493 F. App'x 433, 446 (6th Cir. 2011) (quoting *Bruce v. Beary*, 498

F.3d 1232, 1241 (11th Cir. 2007)) (brackets omitted), or because evidence of a

crime is discovered during the inspection, *Burger*, 482 U.S. at 716 (citing *United*

*States v. Villamonte-Marquez*, 462 U.S. 579, 583-84, and n.3 (1983)).

"[A]dministrative and penal schemes can serve the same purposes" and this

overlap does not render a warrantless administrative search unlawful.  *Id.* at 712-

14.

Plaintiffs fail to identify clearly established case law suggesting that the

officers' conduct, as well as the length of the detention, rendered the search

unreasonable.

Plaintiffs cite three cases to show that the alleged unlawfulness of

Defendants' conduct was well established.  (*See* Resp. at 29-30, ECF No. 39 at Pg

ID 1084-85.)  First, none of these cases were decided by the Supreme Court or

Sixth Circuit Court of Appeals.  *See Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir.

2020) (emphasis in original) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858

F.2d 1171, 1177 (6th Cir. 1988)) ("[O]ur sister circuits' precedents are usually

irrelevant to the 'clearly established' inquiry.  The only exception is for

'extraordinary' cases where out-of-circuit decisions 'both point *unmistakably* to' a

holding and are '*so clearly* foreshadowed by applicable direct authority as to leave

*no doubt*' regarding that holding.").  In any event, none of the cases Plaintiffs cite

are factually on point.

In *Showers v. Spangler*, 182 F.3d 165 (3d Cir. 1999), the officer exceeded

the authority vested by the administrative regime to inspect records by engaging in

a general search of the plaintiffs' business premises and personal residence.  *Id*. at

172-73.  The Third Circuit further found that the officer's "exhaustive search of

[the plaintiffs'] home and business had all the hallmarks of a purely criminal

investigation."  *Id*. at 173.  Similarly, in *United States v. Knight*, 306 F.3d 534 (8th

Cir. 2002), the officer exceeded the scope of the search authorized by the

administrative scheme when he searched a truck driver's briefcase without the

driver's consent.  *Id*. at 535-36.  The search of miners for smoking materials also

was found to go beyond the scope of any regulatory or statutory scheme in

*Commonwealth v. Burgan*, 450 S.E.2d 177 (Va. Ct. App. 1994), as the regulations

did not authorize inspection or search of the individual miners but only set

minimum safety standards for the mine owners to follow.  *Id*. at 179.  Plaintiffs'

allegations do not support their assertion that Defendants exceeded the scope of the

search authorized by the MVSRA.  Nor do the allegations support Plaintiffs' claim

that Drakes Collision employees were unlawfully seized or searched.  For these

reasons, Plaintiffs fail to demonstrate that Defendants violated a clearly established

right.

### 5)     Summary

Contrary to Plaintiffs' assertion otherwise, there does exist "some anomaly

called 'a warrantless administrative search', which [does not] belie[] any and all

common sense" or "common constitutional principles[.]"  (Pls.' Resp. Br. at 2,

ECF No. 39 at Pg ID 1057.)  Further, despite the number of times Plaintiffs state

otherwise in their response to Womble's motion, a search conducted pursuant to

the MVSRA falls within this well-established exception to the Fourth

Amendment's warrant requirement for administrative inspections of closely

regulated businesses.  This Court concludes that the motor vehicle repair industry

is a closely regulated industry.  In any event, Plaintiffs identify no case law that

would have informed the officers otherwise and thus that their search pursuant to

the MVSRA was unlawful.  Finally, Plaintiffs do not allege facts suggesting that

the administrative search of Drakes Collision was performed in an unreasonable

manner.

For these reasons, Plaintiffs' claims based on their belief that the search and seizure were unlawful fail to state a claim upon which relief can be granted. Plaintiffs' claim alleging a conspiracy to violate their Fourth Amendment rights fails for the same reasons.

**B.     Plaintiffs' Substantive Due Process & Equal Protection Claims**

Although the headings of Plaintiffs' § 1983 claims refer only to Fourth Amendment violations based on false arrest and imprisonment and unreasonable search and seizure (Am. Compl. at 31, 38, ECF No. 19 at Pg ID 395, 402), they mention the Fourteenth Amendment Due Process and Equal Protection Clauses as well within those counts (*see, e.g., id.* ¶¶ 81, 91, 92, 98, Pg ID 395,400, 402-03). Search and seizure claims are analyzed, however, only under the rubric of the Fourth Amendment, not the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Pleasant v. Zamieski*, 895 F.2d 272, 276 n.2 (6th Cir. 1990), *cert. denied*, 498 U.S. 851 (1990)) ("*Graham* 'preserves fourteenth amendment substantive due process analysis for those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement official's arrest, investigatory stop or other seizure.") (brackets omitted).  "'Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not

33

the more generalized notion of substantive due process, must be the guide for

analyzing these claims.'"  *Lewis*, 523 U.S. at 842 (quoting *Albright v. Oliver*, 510

U.S. 266, 273 (1994)) (brackets omitted).

To the extent Plaintiffs are asserting independent due process or equal

protection claims, Womble argues that they fail to state a claim upon which relief

may be granted.  (Mot. at 38-43, ECF No. 37 at Pg ID 948-53.)  First, Womble

contends that the factual allegations do not set forth "arbitrary and capricious" or

"conscience-shocking" actions.  (*Id*. at 39-41, Pg ID 949-51.)  Second, Womble

argues that Plaintiffs' factual allegations do not satisfy the elements of an equal

protection claim.  (*Id*. at 41-43, Pg ID 951-953.)

Plaintiffs fail to respond to Womble's arguments.  Thus, the Court deems the

claims waived.  *See, e.g.*, *Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007)

(affirming the district court's conclusion that the plaintiff abandoned certain claims

by failing to raise them in his brief opposing the government's motion to dismiss);

*Mekani v. Homecomings Fin.*, LLC, 752 F.Supp.2d 785, 797 (E.D. Mich. 2010)

(stating that where a plaintiff fails to respond to an argument in a motion to

dismiss, "the Court assumes he concedes this point and abandons the claim").

Moreover, other than conclusory allegations, Plaintiffs' Amended Complaint does

not raise an inference that the search and seizures described occurred because of

anyone's race, religion, or ethnicity.  *See Iqbal*, 556 U.S. at 680-81 (an allegation

34

of conduct taken "solely on account of [the plaintiff's] religion, race, and/or national origin" is "not entitled to be assumed true"); *see also Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 684 (6th Cir. 2011) (finding that the district court erred in denying the defendants' motion to dismiss where the plaintiffs' complaint alleged "[n]othing but legal conclusions" to "suggest[] that the state defendants acted with unlawful discriminatory animus.").

### C.   Plaintiffs' "Anti-Steering" Statute Claim

In Count VI of their Amended Complaint, Plaintiffs allege that the Auto Club Defendants violated section 2110B of Michigan's Insurance Code, Mich. Comp. Laws § 500.2110B, which Plaintiffs refer to as Michigan's "Anti-Steering" statute.  Specifically, Plaintiffs assert a violation of subsection (1) of the statute:

> An automobile insurance policy and an automobile insurer and its employees, agents, and adjusters shall not unreasonably restrict an insured from using a particular person, place, shop, or entity for the providing of any automobile repair or automobile glass repair or replacement service or product covered by the policy.

*Id.* § 500.2110B(1).  The Auto Club Defendants seek dismissal of the claim, arguing that the statute does not provide Plaintiffs with a private right of action. Even if it does, the Auto Club Defendants alternatively argue that Plaintiffs' allegations do not support a violation of the statute.

In *McLiechy v. Bristol West Insurance Company*, 474 F.3d 897 (6th Cir. 2007), the court held that "Chapter 21 [of Michigan's Insurance Code] does not

create a private cause of action because its remedial scheme is not 'plainly inadequate.'" *Id*. at 900.  In *McLiechy*, the plaintiffs challenged the insurance rates charged by their insurance company.  *Id*. at 898.  The Sixth Circuit relied on the remedial scheme set forth in the statute for individuals to challenge an insurer's denial of insurance or the premium for insurance, Mich. Comp. Laws § 500.2113(1), to find that the legislature did not intend to create a private cause of action, *McLiechy*, 474 F.3d at 899.

While section 500.2113 is found within Chapter 21 of Michigan's Insurance Code, the remedial scheme relied on by the *McLiechy* court does not provide a mechanism for claiming violations of section 500.2110b[21].  *See* Mich. Compl. Laws § 500.2113(1).  Thus, this Court is not convinced that the holding in *McLiechy* applies here.  Nevertheless, even if a private cause of action exists under section 500.2110b, the statute is directed at the rights of *insureds* under their insurance policies.[22]  It does not appear that the Michigan Legislature intended to

_____

[21] Section 500.2110b expressly permits insurers to establish relationships with preferred repair facilities.  Mich. Comp. Laws § 500.2110b(2).  While the statute requires insurers to inform their insureds that they have no obligation to use these preferred facilities, nothing in the statute prohibits insurers from encouraging insureds to use those facilities as opposed to others.  *Id*

[22] Section 500.2113 provides a scheme to resolve a person's claim "that an insurer has improperly denied him or her automobile insurance or home insurance or has charged an incorrect premium for that insurance …."  Mich. Comp. Laws § 500.2113(1).

create a right of action for repair facilities under the statute. Plaintiffs provide no

support for their standing to bring a private cause of action under the statute.

The Court further believes that Plaintiffs' claim under the statute fails

because the facts alleged in the Amended Complaint do not plausibly suggest that

the Auto Club Defendants "unreasonably restrict[ed] an insured from using a

particular … shop … for the providing of any automobile repair …." Mich. Comp.

Laws § 500.2110b(1). Plaintiffs allege only that the Auto Club Defendants

"steered" individuals away from Drakes Collision "by making derogatory and

defamatory statements" to its customers. (*See, e.g.*, Am. Compl. ¶ 133, ECF No.

19 at Pg ID 422.) At most Plaintiffs' allegations suggest that the Auto Club

Defendants deterred insureds from using Drakes Collision, not that they

"unreasonably restrict[ed]" which repair facilities their insureds could use.

### D.  Plaintiffs' Defamation Claim

The moving defendants seek dismissal of Plaintiffs' defamation claim

arguing *inter alia* that Plaintiffs do not plead sufficient facts to support their claim.

A defamation claim under Michigan law requires proof of four elements:

> "(1) a false and defamatory statement concerning the
> plaintiff, (2) an unprivileged communication to a third
> party, (3) fault amounting at least to negligence on the
> part of the publisher, and (4) either actionability of the
> statement irrespective of special harm (defamation per
> se) or the existence of special harm caused by
> publication."

37

*Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010) (quoting

*Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005)).  "A communication is

defamatory if it tends so to harm the reputation of another as to lower him in the

estimation of the community or to deter third persons from associating or dealing

with him."  *Id.* (internal quotation marks and citations omitted).  While a business

"does not have a reputation in a personal sense … it does have a business

reputation that can be defamed."  *Mich. Microtech, Inc. v. Federated Publ'ns, Inc.*,

466 N.W.2d 717, 720 (Mich. Ct. App. 1991).

"Generally, 'words charging the commission of a crime are defamatory per

se, and hence, injury to the reputation of the person defamed is presumed to the

extent that the failure to prove damages is not a ground for dismissal.'"  *Marks*

*One Car Rental, Inc. v. Auto Club Grp. Ins. Co.*, 761 F. App'x 516, 522 (6th Cir.

2019) (quoting *Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381 (Mich.

Ct. App. 2000)) (additional citations omitted); *see also* Mich. Comp. Laws

§ 600.2911.  However, defamation per se does not encompass words imputing

every crime or criminal offense.  *See Marks One Car Rental*, 761 F. App'x at 525.

Rather, "words charging an individual with a crime only constitute defamation per

se if the crime involves moral turpitude or would subject the person to an infamous

punishment."  *Lakin v. Rund*, 896 N.W.2d 76, 81 (Mich. Ct. App. 2016) (analyzing

conflicting Michigan law as to what constitutes defamation per se but concluding

that the Michigan Supreme Court's definition in *Taylor v. Kneeland*, 1 Doug 67, 72 (Mich. 1843) "has never been clearly overruled or superseded" and therefore "remains the controlling law in Michigan"). Further, the plaintiff must establish that his or her claims arise as defamation per se—that the allegations set forth in the contested statements fall within a criminal offense. *See Nehls v. Hillsdale Coll.*, 65 F. App'x 984, 990-91 (6th Cir. 2003) (explaining that "Michigan's defamation statute does not categorize fraud as defamation per se" and that "[w]hile Michigan has indeed, via statute, criminalized certain types of fraudulent conduct[,]" the plaintiff "fail[ed] to offer any explanation as to why the allegations set forth in the contested statements fall within the purview of the statute").

A plaintiff alleging defamation must plead the claim "with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Thomas M. Cooley Law Sch. v. Doe*, 833 N.W.2d 331, 341 (Mich. Ct. App. 2013) (citing *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 394 (Mich. Ct. App. 1992)); *see also Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 867 (6th Cir. 2020) (quoting *Ghanam v. Does*, 845 N.W.2d 128, 142 (Mich. Ct. App. 2014)) ("In Michigan, a 'plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory.'"). The plaintiff must specifically allege "'*who* published the defamatory statement, *when* it was published, and, most importantly,

39

a plaintiff must identify *the precise materially false statement* published.'"
*Ryniewicz*, 803 F. App'x at 867 (emphasis added) (quoting *Rouch v. Enquirer &
News of Battle Creek Mich.*, 272 487 N.W.2d 205 220 (Mich. 1992) (Riley, J.,
concurring)) (additional citation omitted).  The Auto Club Defendants and Womble
contend that Plaintiffs' Amended Complaint fails to satisfy these pleading
requirements.  Jackson and Berry argue that neither Plaintiffs' pleading, nor the
affidavits attached thereto, provide any factual details to establish their liability for
defamation—or, in fact, *any* of the claims asserted.

In their Amended Complaint, Plaintiffs do not allege that Jackson, Berry, or
Womble made any derogatory statements.  The pleading, instead, refers generally
to "Defendant OCATS", "Defendant Officers" or "Officers of Defendant
OCATS".  (*See, e.g.*, Am. Compl. ¶¶ 51, 66, 138, 139, ECF No. 19 at Pg ID 383,
388, 424-25.)  Plaintiffs accordingly fail to plead a viable defamation claim against
these Defendants.

Plaintiffs' factual allegations concerning Taylor, as relevant to their
defamation claim, are as follows:

- He "was instrumental in the slanderous and defamatory allegations that resulted in the warrantless search of Plaintiff Drakes Collision; and he contacted Drakes Collision customers and "unlawfully steere[d]" those customers away.  (Am. Compl ¶ 32, ECF No. 19 at Pg ID 373.)

- He, along with Comini and Rembo, made "inflammatory and false allegations about Plaintiff Shammami's alleged criminal association with a rival auto theft team."  (*Id.* ¶¶ 99,106, 110, 128, Pg ID 403, 409, 411, 420.)

- "During the course of multiple SIU insurance investigations, did make derogatory, slanderous and defamatory commentary to its policyholders regarding Plaintiff Drakes Collision and Plaintiff Shammami" and "made specific allegations that Plaintiff Shammami and Plaintiff Drakes Collision were engaged in public corruption conspiracy, receiving and concealing stolen property and insurance fraud, all felony crimes and all crimes of moral turpitude." (*Id.* ¶ 141, Pg ID 427.)

These allegations are insufficient to specifically plead defamation. They do not identify with detail the "where, when, or to whom" that is required to state a claim. *See supra*. Plaintiffs provide no further factual details in response to Taylor's motion to dismiss to suggest that they could allege a plausible defamation claim against him.[23]

Plaintiffs assert even fewer allegations concerning Rembo in connection with their defamation claim. Each reference repeats the allegations set forth above regarding statements about "Shammami's alleged criminal association with a rival auto theft team." (Am. Compl. ¶¶ 99, 106, 110, 128, Pg ID 403, 409, 411, 420.) As such, Plaintiffs do not state a viable defamation claim against Rembo, either.

---

[23] Plaintiffs assert that videotaped interviews of Auto Club policyholders capture the defamatory statements made by Taylor, Rembo, and Comini (*see* Pls. Resp. Br. at 17-19, ECF No. 28 at Pg ID 728-30; *see also* Am. Compl. ¶¶ 69-70, 78, ECF No. 19 at Pg ID 389-90, 393.) Yet, despite the fact that these interviews were conducted by a private investigator hired by Plaintiffs' counsel, Plaintiffs have neither pled nor offered in their response brief the contents of the interviews to fill in the specifics required to properly plead their defamation claim.

As to Comini, Plaintiffs allege:

- The October 22, 2019 search "was precipitated by [her] false, slanderous and racially motivated allegations."  (*Id*. ¶ 36, Pg ID 375.)

- She "unlawfully conspired with Defendant OCATS, Defendant NICB and Defendant NICB, *suggesting* Plaintiff Shammami was engaged in criminal conduct (a crime of moral turpitude) …."  (*Id*. ¶ 52, Pg ID 384 (emphasis added).)

- She went to Drakes Collision on September 3, 2019, and, "in the presence of third parties, *suggested* an improper and unlawful connection between Plaintiff Shammami, Action Auto Theft Team and the manner in which [a] vehicle was recovered and towed to Plaintiff Drakes Collision."  (*Id*. ¶ 62, Pg ID 386-87 (emphasis added).)

- Along with Rembo and Taylor, Comini made "inflammatory and false allegations about Plaintiff Shammami's alleged criminal association with a rival auto theft team …."  (*Id*. ¶¶ 99, 106, 110, 128, Pg ID 403-04, 409, 411, 420.)

- She "made statements in the presence of third party [sic] insurance customers accusing Plaintiff Shammami and Plaintiff Drakes Collision of bribery" and "the felony crime of Receiving and Concealing Stolen Property …."  (*Id*. ¶ 138, 139, Pg ID 425.)  She "informed AAA policyholders that Plaintiff Shammami and Plaintiff Drakes were in possession of stolen wheels and tires and billing for wheels and tires they did not own."  (*Id*. ¶ 139, Pg ID 425-26.)

- "During the course of multiple SIU insurance investigations," she made "derogatory, slanderous and defamatory commentary to its policyholders regarding Plaintiff Drakes Collision and Plaintiff Shammami" and "made specific allegations that Plaintiff Shammami and Plaintiff Drakes Collision were engaged in public corruption conspiracy, receiving and concealing stolen property and insurance fraud, all felony crimes and all crimes of moral turpitude."  (*Id*. ¶ 141, Pg ID 427.)

Again, these allegations fail to identify with specificity what Comini said, who the policyholders were to whom she said it, and/or when these conversations occurred. Plaintiffs make no attempt to cure these deficiencies in response to Comini's motion to dismiss.

**E. Civil Conspiracy**

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 358-59 (Mich. Ct. App. 1992) (citations omitted). "[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) (internal quotations omitted).

In their Amended Complaint, Plaintiffs allege that Defendants conspired "to commit the torts … for the improper purpose o[]f depriving the Plaintiffs of their constitutionally protected right to be free from unlawful searches and seizures, false arrest and detention[.]" (Am. Compl. ¶ 146, ECF No. 19 at Pg ID 429-30.) The Court has held, however, that the search and seizures described in the Amended Complaint were not unlawful. In other words, Plaintiffs fail to allege facts to establish a concerted action by Defendants to accomplish an unlawful

purpose or a lawful purpose through unlawful means.  Plaintiffs' civil conspiracy

claim must therefore be dismissed.

## IV.    Conclusion

For the reasons discussed, the Court holds that Plaintiffs fail to plead facts to

support their claim that Defendants engaged in an unlawful search or seizure.

Because the vehicle repair industry is closely regulated, the warrantless inspections

authorized in the MVSRA supported the search of Drakes Collision's premises,

parts records, and parts inventories by the Michigan Secretary of State, his or her

designate, and accompanying law enforcement officers.  For their safety and to

complete the search, those individuals were authorized to reasonably detain

Plaintiffs and ask Plaintiffs to secure their weapons in their personal vehicles or

toolboxes.  Plaintiffs fail to allege facts suggesting that any search or seizure was

conducted in an unreasonable manner or, at the very least, that well-established

case law informed Defendants that they acted unreasonably.

For these reasons, the Court is granting the moving defendants' motions to

dismiss with respect to Plaintiffs' search and seizure related claims (Counts I, II,

IV, V and VIII).

Plaintiffs do not plead facts to support a violation of their rights to due

process or equal protection and so, to the extent their § 1983 claims are premised

on those constitutional clauses, the Court also is granting the moving defendants'

motions to dismiss those claims.

Plaintiffs also do not plead facts to support a claim under Michigan

Compiled Laws section 500.2110B, as alleged in Count VI of their Amended

Complaint.  As Plaintiffs assert this claim only against the Auto Club Defendants,

the claim is being dismissed.

Plaintiffs fail to plead their defamation claim (Count VII) against the moving

Defendants with sufficient specificity, and so the Court is dismissing that claim

against the Auto Club Defendants, Berry, Jackson, and Womble.

Accordingly,

**IT IS ORDERED** that the pending motions to dismiss (ECF Nos. 22, 25,

26, & 37) are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims against Defendants

Auto Club Group Insurance Company, Melissa Comini, Sheryl Rembo, Josh

Taylor, Justin Berry Chad Jackson, and Jarod Womble are **DISMISSED WITH**

**PREJUDICE** and these defendants are **DISMISSED AS PARTIES TO THIS**

**ACTION**.

**IT IS FURTHER ORDERED** that Count VI of Plaintiffs' Amended

Complaint is **DISMISSED WITH PREJUDICE**.

      **IT IS SO ORDERED**.

s/ Linda V. Parker_____
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: November 30, 2020